## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DAVID L. ADDINGTON,** | ) | |
| Plaintiff | ) | Civil Action No. 2:18cv00034 |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **ANDREW SAUL,**[1] | ) | By: Pamela Meade Sargent |
| **Commissioner of Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, David L. Addington, ("Addington"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Addington protectively filed his application for DIB on September 22, 2014, alleging disability as of November 13, 2013, based on chronic right shoulder tendonitis; severe varicose veins in the feet and legs, bilaterally; chronic lower back pain; depression; and anxiety. (Record, ("R."), at 18, 207-08, 276.) The claim was denied initially and upon reconsideration. (R. at 130-32, 136-38, 141-44, 146-48.) Addington then requested a hearing before an administrative law judge, ("ALJ"). (R. at 149-50.) The ALJ held a hearing on April 20, 2017, at which Addington was represented by counsel. (R. at 34-66.)

By decision dated June 28, 2017, the ALJ rendered a partially favorable decision. (R. at 18-27.) The ALJ found that Addington met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 20.) The ALJ found that Addington had not engaged in substantial gainful activity since November 13, 2013, the alleged onset date. (R. at 20.) The ALJ found that the medical evidence established that Addington had severe impairments, namely adhesive capsulitis of the right shoulder and depressive disorder, but he found that Addington did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-21.) The ALJ found that Addington had the residual functional

capacity to perform simple, routine light[2] work that required no more than frequent kneeling, stooping, crouching or climbing of ramps and stairs; that required no more than occasional pushing/pulling with the right upper extremity or reaching in any direction; that required no more than occasional crawling or climbing of ladders, ropes or scaffolds; and that did not require him to work around hazards. (R. at 22.) The ALJ found that Addington was not capable of performing any of his past relevant work. (R. at 25.) The ALJ found that, prior to June 10, 2016, Addington was an "individual closely approaching advanced age," but, on June 10, 2016, his age category changed to an "individual of advanced age." (R. at 25.) The ALJ found that, prior to June 10, 2016, based on Addington's age, education, work history and residual functional capacity and the testimony of a vocational expert, a significant number of jobs existed in the national economy that Addington could perform, including jobs as a non-postal mail clerk, a parking lot attendant and a storage facility rental clerk. (R. at 25-26.) Thus, the ALJ concluded that Addington was not under a disability as defined by the Act and was not eligible for DIB benefits prior to June 10, 2016. (R. at 27.) *See* 20 C.F.R. § 404.1520 (g) (2019). However, the ALJ found that, beginning on June 10, 2016, and continuing through the date of the decision, Addington was disabled under Rule 202.06 of the Medical-Vocational Guidelines, ("Grids").[3] (R. at 27.) *See* 20 C.F.R. §§ 404.1560(c), 404.1566 (2019).

After the ALJ issued his decision, Addington pursued his administrative appeals, (R. at 202), but the Appeals Council denied his request for review. (R. at 1-

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

[3] Therefore, Addington must show he was disabled between November 13, 2013, the alleged onset date, and June 9, 2016, the date prior to the date on which the ALJ found Addington's period of disability began, in order to be eligible for benefits.

5.) Addington then filed this action seeking review of the ALJ's partially unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Addington's motion for summary judgment filed March 7, 2019, and the Commissioner's motion for summary judgment filed April 4, 2019.

## *II. Facts*

Addington was born in 1961, (R. at 207, 272), which, at the time of his alleged onset date, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). However, on or about June 10, 2016, Addington's age category changed to a "person of advanced age" under 20 C.F.R. § 404.1563(e). He has a high school education and nurses aide training. (R. at 277.) Addington has past work experience as an operating room technician. (R. at 42.) Addington testified he was taken out of work in November 2013 due to a work-related injury to his right shoulder. (R. at 44.) He attempted to return to work for approximately two and a half to three months, but he continued to have right shoulder pain, which prevented him from fully performing his job duties. (R. at 45.) He underwent right shoulder surgery in March 2014, but, thereafter, he developed a frozen shoulder, requiring an additional procedure in June 2014. (R. at 45.) Addington stated he continued to have problems with his right upper extremity, but attempted another return to work, which lasted only about two weeks. (R. at 45-46.) He testified he continued to have right shoulder pain, which limited his ability to reach overhead, and he could lift and carry items weighing up to only five pounds. (R. at 46.) Addington stated he had not attempted to return to work since 2014. (R. at 44.) He stated he took a lot of medications that affected his stomach and caused him to lose weight during the times he was attempting to return to work, which really "set [him] back." (R. at 48.) He

stated he took hydrocodone and over-the-counter ibuprofen for pain. (R. at 53-54.) Addington testified to other physical ailments, including neck pain radiating down the left upper extremity, chronic prostatitis, right lower back pain with radicular pain and numbness, painful varicose veins, foot pain and ankle swelling. (R. at 47-50, 53-55.) Addington testified he could grip and grasp objects with the left hand for about 10 minutes, and he could not lift items weighing more than 10 pounds. (R. at 48-49.)

Addington also testified to becoming severely depressed, stating he "did not think [he] could make it another day." (R. at 50.) He testified to isolating himself at home and having thoughts of self-harm, for which he voluntarily admitted himself. (R. at 50-51.) Addington stated he also was psychiatrically hospitalized for eight days in July 2015 at the Veterans Affairs Hospital, ("VA"). (R. at 51.) After that time, he continued to receive mental health counseling through the VA. (R. at 51.) Addington testified he continued to isolate himself, he was tired, his mind raced, and he had a low appetite. (R. at 51-53.) He stated he was taking Cymbalta for his depression and Ambien for sleep. (R. at 53.)

Barry Hensley, a vocational expert, also was present and testified at Addington's hearing. (R. at 58-64.) Hensley classified Addington's past work as an operating room technician as light and skilled, as generally performed, but medium[4] as performed by Addington. (R. at 58.) He was asked to consider a hypothetical individual of Addington's age, education and work history, who could perform

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting and carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2019).

simple, routine light work, but could use the right upper, dominant extremity no more than occasionally for pushing, pulling or reaching in any direction; who could frequently kneel, stoop, crouch and climb ramps and stairs; who could occasionally crawl and climb ladders, ropes and scaffolds; and who could not work around hazards, such as moving machinery and unprotected heights.  (R. at 59.)  Hensley testified such an individual could not perform Addington's past work, but could perform other jobs existing in significant numbers in the national economy, including those of a non-postal mail clerk, a parking lot attendant and a storage facility rental clerk.  (R. at 59-60.)  Hensley next testified that the same individual, but who was limited to the performance of sedentary[5] work, could not perform Addington's past work.  (R. at 60-61.)  Hensley next testified that a hypothetical individual with the limitations set forth in Dr. Moore's September 25, 2014, assessment could perform only a limited range of sedentary work.  (R. at 61-62.)  Hensley testified that an acceptable rate of absenteeism was one day monthly.  (R. at 62.)  Hensley also testified that an individual who would be off task 15 percent on a routine and regular basis, could not perform competitive employment.  (R. at 62-63.)   He testified that the first hypothetical individual, but who also could demonstrate reliability and relate predictably in social situations on a less than occasional basis, could not perform any jobs.  (R. at 63-64.)

In rendering his decision, the ALJ reviewed medical records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Leslie E. Montgomery, Ph.D., a state agency psychologist; Dr. William

---

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting of articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. § 404.1567(a) (2019).

Rutherford, Jr., M.D., a state agency physician; Dr. Samuel Breeding, M.D.; Holston Valley Ambulatory Surgery Center; Wellmont Rehabilitation & Sports Clinic; Southwest Surgical Clinic; Watauga Orthopaedics; Dr. Luciano D'Amato, M.D.; Dr. R. Michael Moore, M.D.; Danny J. Minor, D.C., a chiropractor; Dr. Nicanor Concepcion, M.D., a urologist; Lonesome Pine Hospital, ("Lonesome Pine"); Mountain View Regional Medical Center; Mountain Home VA Healthcare System; Dr. Souhail Shamiyeh, M.D.; Dr. Mark Baxter, D.P.M., a podiatrist; and Angela Webb, A.P.R.N.-BC, a board-certified advanced practice registered nurse.

Addington presented to the emergency department at Lonesome Pine on November 13, 2013, after injuring his right shoulder at work lifting a tray.  (R. at 325.)  On examination of the shoulder, Addington had normal strength and range of motion, as well as no swelling, but there was tenderness.  (R. at 327.)  He could flex to 120 degrees, extend to 30 degrees and abduct to 90 degrees.  (R. at 327.)  X-rays of the right shoulder showed no acute bony abnormalities.  (R. at 334.)  Addington was diagnosed with shoulder sprain and strain, for which he was advised to use ice, heat and anti-inflammatory medication for pain and avoid heavy lifting, pushing and pulling until cleared by workers' compensation or orthopedics.  (R. at 327.)  He was prescribed Voltaren.  (R. at 328.)

Addington saw Dr. Samuel D. Breeding, M.D., at HMG Occupational Medicine, on November 18, 2013, in connection with his workers' compensation claim.  (R. at 338.)  Addington reported continued pain, difficulty raising his arm above his head and difficulty putting his arm behind his back.  (R. at 338.)  He was in no acute distress with a normal affect.  (R. at 339.)  He held his right arm in a guarded position, but there was no discoloration or swelling.  (R. at 339.)  Addington exhibited tenderness to palpation of the anterior aspect of the shoulder, his

movement was very guarded, active abduction and flexion was 90 degrees, passive movement was 120 degrees, internal and external rotation was very guarded, and pulse was normal. (R. at 339.) Dr. Breeding diagnosed a shoulder sprain, he prescribed steroids, and he ordered an MRI. (R. at 339.) When Addington returned to Dr. Breeding on December 2, 2013, he reported continued pain. (R. at 336.) Physical examination was unchanged from previously. (R. at 337.) An MRI was performed on November 22, 2013, which showed a narrow subacromial arch at the level of the lateral acromion process with moderate changes of tendinitis and tendinopathy without evidence of a full-thickness tear. (R. at 337, 496.) Dr. Breeding did not think Addington had a surgical problem, and Addington wished to pursue shoulder injections and physical therapy. (R. at 337.) Dr. Breeding prescribed hydrocodone-acetaminophen[6] and prednisone. (R. at 337.)

Addington saw Dr. Eric D. Parks, M.D., at Watauga Orthopaedics, on December 12, 2013, with continued right shoulder complaints. (R. at 460.) He was fully oriented with a normal mood and affect. (R. at 461.) He exhibited tenderness of the bicipital groove, the subacromial bursa and of the subdeltoid bursa, painful range of motion, positive Neers test,[7] positive Speeds test,[8] positive empty can test[9] and rotator cuff pain to resistance testing. (R. at 461.) In all other respects, examination of the right shoulder was normal, including reflexes and sensation. (R.

---

[6] Hydrocodone-acetaminophen is sold under the brand name Norco. *See* drugs.com/norco.html (last visited Mar. 20, 2020).

[7] Neers test is used to identify possible subacromial impingement syndrome. *See* physio-pedia.com/Neers_Test (last visited Mar. 20, 2020).

[8] Speeds test is used to test for superior labral tears or bicipital tendonitis. *See* physio-pedia.com/Speeds_Test (last visited Mar. 20, 2020).

[9] Empty can test is used to assess the supraspinatus muscle and tendon. *See* physio-pedia.com/Empty_Can_Test (last visited Mar. 20, 2020).

at 461-62.) Dr. Parks diagnosed Addington with bicipital tenosynovitis; disorder of the shoulder bursa; and localized, primary osteoarthritis of the shoulder, and he administered a biceps tendon sheath injection. (R. at 462.) Addington was released to return to full-duty work without restrictions on December 30, 2013, Dr. Parks prescribed Celebrex and Lortab, and he instructed Addington in a home exercise program. (R. at 462.) On January 9, 2014, Addington noted an improved range of motion, and although Celebrex helped, he had continued pain at the biceps tendon. (R. at 463.) He wished to discuss either pain medications or a compounding cream. (R. at 463.) At that time, he had been back to work for two weeks. (R. at 463.) A right shoulder examination was normal, except for a positive impingement sign, tenderness over the bicipital groove and a positive Speeds test. (R. at 464.) Otherwise, Addington had full range of motion, well-maintained strength and no neurovascular deficits. (R. at 464.) Dr. Parks's diagnoses remained the same, and he prescribed Norco. (R. at 464-65.) He noted Addington was making "good progress," and he advised him to continue home exercises, Celebrex and activity modifications. (R. at 465.) On February 27, 2014, Addington stated he had some continued pain, but 800 mg ibuprofen daily provided relief. (R. at 466.) He reported the December 2013 injection was helpful, and he estimated he was at least 50 percent better. (R. at 466.) He voiced no other complaints. (R. at 467.) Physical examination showed normal alignment and appearance of the right shoulder; full range of motion; well-maintained strength; no instability; and no neurovascular deficits, but impingement signs continued to be positive; he had tenderness over the bicipital groove; and Speeds test was positive. (R. at 467.) Given the continued impingement symptoms with bicipital tenosynovitis, which had been unresponsive to rehab, prescription anti-inflammatory medication and injection, Dr. Parks referred Addington to Dr. Wells for a potential shoulder arthroscopy, subacromial decompression and biceps tenotomy/tenodesis. (R. at 468.) Dr. Parks advised

Addington to continue full-duty work for the time being.  (R. at 468.)

Addington saw Dr. J. Michael Wells, M.D., an orthopaedic surgeon at Watauga Orthopaedics, on March 5, 2014, for a surgical consultation.  (R. at 469.) On examination, Addington was fully oriented with a normal mood and affect.  (R. at 470.)  He exhibited tenderness of various areas of the right shoulder; he had subjective pain at the mid proximal deltoid and anterolateral acromion; near full range of motion was present, but forward flexion and abduction were limited by pain; Neers test, Hawkins test,[10] O'Briens test[11] and Speeds test all were positive; and he had slightly decreased strength.  (R. at 471.)  Dr. Wells concluded Addington had significant anterior glenohumeral pain and anterior labral pain extending to the bicipital groove, and he scheduled him for an arthroscopic surgical procedure.  (R. at 471.)  Dr. Wells performed a limited glenohumeral debridement with arthroscopic biceps tenodesis and an arthroscopic subacromial decompression with bursectomy, all without complication, on March 17, 2014.  (R. at 364-65.)

When Addington returned to Watauga Orthopaedics for a surgical follow up on March 26, 2014, Samuel W. Cook, P.A.-C, a certified physician assistant, noted he was doing well.  (R. at 472.)  Physical examination showed his wound was clean and dry, there was no warmth, the compartment was soft, there was an appropriate range of motion, and the shoulder was neurovascularly intact.  (R. at 474.)  Cook advised Addington to start pendulum movements, and he was instructed to remain

---

[10] Hawkins test is commonly used to identify possible subacromial impingement syndrome. *See* physio-pedia.com/Hawkins_/Kennedy_Impingement_Test_of_the_Shoulder (last visited Mar. 20, 2020).

[11] O'Briens test is used to identify potential labral or acromioclavicular lesions as a cause for shoulder pain.  *See* physio-pedia.com/O'Briens_Test (last visited Mar. 20, 2020).

off work. (R. at 474.) On April 9, 2014, Addington reported deltoid tightness with occasional pain, but no tingling or numbness. (R. at 475.) Examination showed normal reflexes and sensation, bilaterally; there was no right shoulder swelling; compartments were soft; he was neurovascularly intact; and he had passive forward flexion to 80 degrees. (R. at 477.) Cook noted Addington's pain and swelling continued to improve as expected, and they addressed the need for sling use and activity restriction. (R. at 477.) Cook also noted that both he and Addington were pleased with the current progress, and he referred Addington for physical therapy. (R. at 477.)

Addington began physical therapy for his right shoulder at Wellmont Rehabilitation & Sports Clinic on April 16, 2014. (R. at 388.) He rated his right shoulder pain as a four on a 10-point scale, and he reported extremity weakness, decreased range of motion, decreased functional use and decreased ability to perform activities of daily living. (R. at 388-89.) Matthew Ward, P.T., a physical therapist, indicated Addington's range of motion in the right shoulder was limited to 64 degrees flexion, 60 degrees abduction, 34 degrees external rotation and 61 degrees internal rotation, all with pain. (R. at 389.) His strength was 2+/5 in all these same areas. (R. at 389.) Ward concluded Addington had decreased right shoulder range of motion, decreased right shoulder manual muscle testing and right shoulder pain. (R. at 390.) However, he deemed Addington's rehab potential as good if he was compliant with a home exercise program and the plan of care. (R. at 390.) Ward scheduled Addington for physical therapy three times weekly for six weeks. (R. at 390.) Addington was compliant with his physical therapy sessions through May 6, 2014. (R. at 391-408.) At that time, Ward completed a reassessment of Addington, which showed 110 degrees flexion, 80 degrees abduction, 27 degrees external rotation and 30 degrees internal rotation. (R. at 408.) Addington rated his pain as a

six on a 10-point scale at that time.  (R. at 408.)

On May 7, 2014, Addington returned to Watauga Orthopaedics, stating he had good days and bad days and that physical therapy aggravated the pain on occasion. (R. at 478.)  He was taking Norco for pain and remained off work at that time.  (R. at 478.)  Addington reported he felt a pop in the shoulder a couple of days previously during physical therapy, associated with some pain and swelling and causing a little bit of a setback.  (R. at 478.)  He was neurovascularly intact and had active forward flexion to over 90 degrees.  (R. at 478, 480.)  Cook stated Addington needed to get back in physical therapy and get a "little aggressive" with range of motion.  (R. at 480.)  Cook kept Addington off work until the next office visit in four weeks, and he prescribed meloxicam.  (R. at 480.)  On May 28, 2014, Addington saw Dr. Wells, reporting continued problems with range of motion and pain, especially during therapy.  (R. at 481.)  He rated his pain as a five on a 10-point scale and stated he could not tolerate meloxicam, but he continued to take Norco and ibuprofen.  (R. at 481.)  On examination, Addington was fully oriented with a normal mood and affect; right radial pulses were normal; he had tenderness of the AC joint, the acromion and the greater tuberosity; subjective pain at the mid proximal deltoid and anterolateral acromion; tenderness of the supraspinatus, the infraspinatus, the subacromial bursa, the subdeltoid bursa and the lateral cuff insertion; he had near full range of motion, but forward flexion and abduction were limited by pain; Neers test, Hawkins test, empty can sign and impingement signs were positive; and he had slightly reduced strength on the right.  (R. at 483.)  Addington's biceps were very stiff.  (R. at 483.) Dr. Wells diagnosed secondary adhesive capsulitis, and he planned to perform a manipulation of the right shoulder under anesthesia.  (R. at 483.)

Addington continued to be compliant with his physical therapy program.  On

May 29, 2014, he advised Rebecca C. Lowe, P.T.A., a physical therapy assistant, that Dr. Wells had diagnosed him with a frozen shoulder and scheduled a manipulation for June 9, 2014. (R. at 428.) Addington underwent this procedure as scheduled, in addition to receiving intra-articular corticosteroid injections while under anesthesia. (R. at 498.) Dr. Wells indicated that the procedure restored full range of motion in forward flexion; abduction; and external and internal rotation. (R. at 498.) On June 18, 2014, Addington rated his pain as a three to four on a 10-point scale, and he stated his range of motion was improved. (R. at 484.) He was continuing to take Norco for pain, and he reported feeling like he was doing much better. (R. at 484, 486.) On examination, Addington's range of motion was "greatly improved;" active forward flexion was nearly 140 degrees; active abduction was 90 degrees and, with help, he could get to 140 degrees. (R. at 485.) Addington did have some endurance strength deficits about the rotator cuff, which Dr. Wells believed due to not having forward flexion or abduction past 90 degrees for the previous eight to 10 weeks. (R. at 485.) Dr. Wells reassured Addington he was "moving in a good direction." (R. at 486.) He continued Addington in physical therapy three times weekly for the next month. (R. at 486.) Dr. Wells stated Addington was doing much better, but he felt the earliest he could return to work would be about two months. (R. at 486.)

Also on June 18, 2014, Addington advised Ward of the good report he had gotten from Dr. Wells, who told him to continue physical therapy and progress to strengthening. (R. at 507-08.) His active assisted range of motion was improved in all planes, but he continued to report pain at the end range of all motions. (R. at 508.) On June 20, 2014, Addington reported an improved ability to perform activities of daily living. (R. at 509.)

On July 8, 2014, Addington saw Dr. R. Michael Moore, M.D., with complaints of being lightheaded. (R. at 577.) Physical examination was normal, and Dr. Moore diagnosed, among other things, insomnia; generalized anxiety disorder; and calcifying tendinitis of the shoulder. (R. at 578.)

On July 9, 2014, Addington returned to physical therapy, reporting that he was moving and using his arm more at home. (R. at 525.) On July 14, 2014, Ward again reassessed Addington's abilities, which included 138 degrees flexion, 126 degrees abduction, 48 degrees external rotation and 52 degrees internal rotation. (R. at 529.) His strength was 4+/5 with all the same movements. (R. at 529.) Ward stated Addington had responded well to physical therapy with positive improvement. (R. at 529.)

On July 16, 2014, Addington advised Dr. Wells that his range of motion was getting much better. (R. at 487.) He could forward flex to nearly 160 degrees and abduct and externally rotate to nearly 90 degrees. (R. at 489.) Dr. Wells noted some mild stiffness with internal rotation and some continued endurance strength deficits, but overall, Addington had made "vast improvements" and was doing much better after the manipulation. (R. at 489.) He released Addington to light-duty work with the following restrictions: no lifting greater than 10 pounds; no overhead use of the right upper extremity; and no taking primary calls until further notice. (R. at 489.) He also continued Addington in once weekly therapy for the next six weeks, and he encouraged him to continue home exercises "religiously." (R. at 489.) On August 8, 2014, Addington stated his shoulder was doing "pretty good," but continued to have daily pain and stiffness since he stopped taking ibuprofen due to stomach upset. (R. at 490.) He rated his pain as a four on a 10-point scale, but indicated it was a seven at times. (R. at 490.) Addington stated he had tried light-duty work, but he

felt it was not in the best interest of his shoulder. (R. at 490.) On examination, Addington was maintaining his range of motion, but continued to have some mild discomfort with extremes of forward flexion and adduction. (R. at 492.) His biceps tenodesis continued to be holding with good biceps tone. (R. at 492.) Dr. Wells removed Addington from work and advised him to finish physical therapy over the coming month, after which time, they would discuss him returning to work without restrictions. (R. at 492.) Dr. Wells thought Addington was "getting close to having a full recovery." (R. at 492.)

On August 6, 2014, Addington expressed his concern that he may not have been ready to return to work on a full-time basis. (R. at 535.) He had continued range of motion and strength deficits, but increased tolerance to increased resistance with most exercises. (R. at 536.)

On August 11, 2014, Addington's complaints included right shoulder pain. (R. at 580.) Physical examination again was normal, and Dr. Moore prescribed Ambien and Norco. (R. at 581.)

When he returned to physical therapy on August 13, 2014, Addington reported he, again, was out of work. (R. at 537.) On August 25, 2014, he stated he could tell a difference in his strength, and by September 3, 2014, Addington stated he was no longer taking pain medications, and he demonstrated increased mobility. (R. at 548, 551-52.) Addington was discharged from physical therapy on September 29, 2014, at which time Ward again reported he had responded well to physical therapy with positive improvement. (R. at 561.) He was instructed in a home exercise program to continue to address his physical impairments. (R. at 561.)

On September 24, 2014, Addington returned to Dr. Wells, reporting his shoulder was doing "pretty good," but with continued pain and stiffness. (R. at 493.) His physical examination was unchanged, and Dr. Wells released him to "ad-lib activity without restrictions." (R. at 494-95.)

On September 25, 2014, Addington requested that Dr. Moore complete disability forms for him. (R. at 624.) Dr. Moore did not record any complaints at that time. (R. at 624.) Physical examination was normal. (R. at 625.) Dr. Moore diagnosed, among other things, calcifying tendinitis of the shoulder; insomnia; generalized anxiety disorder; and depressive disorder, and he prescribed Celexa for depression. (R. at 625.) That same day, Dr. Moore completed a physical assessment of Addington, finding he could lift/carry items weighing up to only five pounds occasionally and up to two pounds frequently, but only with the left arm. (R. at 503-05.) He found Addington could stand/walk a total of three hours in an eight-hour workday, but could do so for only 20 minutes without interruption. (R. at 503.) Dr. Moore found Addington could sit for a total of four hours in an eight-hour workday, but could do so for only 30 minutes without interruption. (R. at 504.) He found Addington could never climb, stoop, kneel, balance, crouch or crawl, and his abilities to reach, to handle and to push/pull with the right arm were affected by his impairment. (R. at 504.) Dr. Moore found Addington could not work around chemicals, dust, noise and fumes, and he opined Addington would be absent from work more than two days monthly. (R. at 505.)

Addington saw Dr. Moore on five more occasions, through January 21, 2015. (R. at 574-76, 627-38.) On October 15, 2014, Addington complained of anxiety. (R. at 574.) Physical examination was normal. (R. at 575.) On October 23, 2014, Addington voiced no complaints to Dr. Moore, and his physical examination was

completely normal. (R. at 627-29.) Dr. Moore's diagnoses remained the same in October and November 2014, and in November 2014, he noted Addington was taking Klonopin for anxiety. (R. at 628, 630-31.) On December 23, 2014, physical examination of the right shoulder revealed pain with abduction and external rotation, tenderness over the biceps tendon, subacromial bursal tenderness and restricted abduction to 90 degrees. (R. at 634.) Dr. Moore's diagnoses of Addington remained unchanged, he refilled his Norco, and he noted a severely restricted range of shoulder motion, preventing his return to work. (R. at 634-35.) Dr. Moore recommended Addington see a workers' compensation physician. (R. at 635.) On January 21, 2015, Addington continued to have significant right shoulder pain and limited motion. (R. at 636.) He also expressed depression due to his limited activities and inability to work. (R. at 636.) Addington's physical examination remained unchanged, as did Dr. Moore's diagnoses. (R. at 637-38.) Dr. Moore refilled Addington's Norco, Ambien and Klonopin. (R. at 638.)

On December 19, 2014, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with Addington's initial DIB claim. (R. at 106.) Leizer opined Addington had no restrictions on activities of daily living; no difficulties maintaining social functioning; no difficulties maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 106.) The same day, Dr. Bert Spetlzer, M.D., a state agency physician, completed a physical residual functional capacity assessment of Addington, finding he could perform medium work with no more than occasional crawling and no more than frequent crouching, kneeling, stooping and climbing of ladders, ropes and scaffolds. (R. at 108-09.) He opined Addington had an unlimited ability to climb ramps and stairs and to balance. (R. at 108.) Dr. Spetzler imposed no manipulative, visual,

communicative or environmental limitations.  (R. at 109.)

Addington returned to Dr. Wells on January 14, 2015, with complaints of continued pain and stiffness in the right shoulder with some loss of movement.  (R. at 620.)  Dr. Wells noted that Addington, overall, was doing fairly well, but had continued pain and stiffness of the right shoulder.  (R. at 622.)  Examination revealed him lacking about 20 degrees of terminal abduction with significant weakness in general.  (R. at 622.)  The rotator cuff was working, but there was some cuff weakness.  (R. at 622.)  Dr. Wells noted Addington continued to lack about 15 degrees of terminal abduction and external rotation, combined.  (R. at 622.)  Forward flexion was to about 140 to 150 degrees, but with significant stiffness, pain and discomfort.  (R. at 622.)  Addington had a large amount of referred pain into the sternum and inferior xiphoid process with active forward flexion.  (R. at 622.)  The "Assessment / Plan" portion of Dr. Wells's progress note is not legible.  (R. at 622.)

On March 10, 2015, Leslie E. Montgomery, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Addington's DIB claim.  (R. at 120-21.)  Montgomery opined he had no limitations in activities of daily living; no difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence or pace; and no repeated episodes of extended-duration decompensation.  (R. at 120.)  On March 11, 2015, Dr. William Rutherford, Jr., M.D., a state agency physician, completed a physical residual functional capacity assessment of Addington, finding he could perform light work that did not require more than occasional pushing/pulling with the right upper extremity.  (R. at 122-24.)  He further found Addington could frequently climb ramps and stairs, stoop, kneel and crouch; occasionally crawl and climb ladders, ropes and scaffolds; and he had an unlimited ability to balance.  (R. at 123.)  Dr.

Rutherford found Addington could occasionally reach with the right upper extremity in front and/or laterally, as well as overhead. (R. at 123.) He found Addington should avoid concentrated exposure to hazards. (R. at 124.)

On March 13, 2015, Addington presented to the VA to transfer care after losing his medical insurance. (R. at 1001.) He reported his shoulder surgery, but stated his shoulder was "better now," although he still could not fully abduct the joint due to some pain. (R. at 1001.) Addington also advised he took Klonopin for anxiety, Ambien for sleep and Norco for pain. (R. at 1001.) He admitted to having some depression and stated he would like to see mental health. (R. at 1001.) On examination, Addington was in no acute distress, and he had an appropriate affect. (R. at 1001.) There was no edema or cyanosis of the extremities, but he had pain on abduction of the right shoulder. (R. at 1001.) A depression screen was positive for moderate depression. (R. at 1006.) Dr. Dante Soriano Loo, M.D., diagnosed, among other things, right shoulder pain; questionable shoulder arthritis; depression; and anxiety. (R. at 1001.) Dr. Loo prescribed sertraline.[12] (R. at 1001.)

Addington saw Dr. Moore on March 24, 2015, with complaints of chronic back strain. (R. at 650.) Examination of the right shoulder again showed pain with abduction and external rotation; tenderness over the biceps tendon; subacromial bursal tenderness; and restricted abduction to 90 degrees. (R. at 651.) Dr. Moore's diagnoses remained unchanged, and he refilled Addington's Klonopin. (R. at 651-52.)

Addington saw Angela Webb, A.P.R.N.-BC, a board-certified advance

---

[12] Sertraline is a generic formulation of Zoloft. *See* medicinenet.com/sertraline/article.htm (last visited Mar. 20, 2020).

practice nurse at the VA, on March 25, 2015, for mental health intake based on his complaints of depression. (R. at 764-71.) He advised he had been treated for his mental health by his primary care provider, including being prescribed Ambien and Klonopin. (R. at 764.) He also reported having attended two mental health counseling sessions with an outside provider at the request of his counsel, which were beneficial. (R. at 764.) Addington reported becoming depressed after losing his job on October 28, 2014. (R. at 764.) Thereafter, he stated he was prescribed Klonopin and Celexa, but he could not tolerate Celexa. (R. at 764.) Addington endorsed symptoms of both depression and anxiety, including worry regarding finances and the failing health of his elderly father, insomnia, successfully treated with Ambien, frequent crying spells and isolative behavior, among other things. (R. at 764-65.) He stated, "I just feel like I get overwhelmed with the attorney telling me to do" various things in an attempt to be approved for disability benefits. (R. at 765.) He denied suicidal or homicidal ideation, as well as psychotic symptoms. (R. at 765.) Addington denied any prior psychiatric hospitalizations. (R. at 765.) He stated Ambien and Klonopin were beneficial without adverse effect. (R. at 766.) On mental status examination, Addington was alert and fully oriented; he was dressed appropriately; he had adequate personal hygiene; he had a smooth and steady gait without tremors or rigidity; he was cooperative; he had no psychomotor retardation/agitation; he had appropriate eye contact; he had a depressed mood with a broad affect congruent to his mood; he displayed intermittent tearfulness; speech was normal; thought processes were logical and goal-directed; remote, recent and immediate recall were intact; no change in cognitive function was noted; and insight and judgment were intact. (R. at 768-69.) Webb diagnosed Addington with major depressive disorder, single episode, moderate, with anxious distress, and she recommended he continue with outpatient care. (R. at 769.) Webb also prescribed Zoloft. (R. at 770.)

Addington presented to the emergency department of Mountain View Regional Medical Center on April 23, 2015, with physical complaints not related to his right shoulder.  (R. at 684, 689.)  On examination, he was fully oriented and in no distress; musculoskeletal exam revealed a normal range of motion and no edema or tenderness; reflexes were normal, and there were no cranial nerve deficits; and mood, affect and behavior were normal.  (R. at 690-91.)

On April 29, 2015, Addington returned to Dr. Loo at the VA, with various physical complaints not related to his right shoulder.  (R. at 973-75.)  He also stated he was under a lot of stress since he lost his job a few months previously.  (R. at 974.)  On examination, Addington appeared somewhat anxious, but he was alert and oriented.  (R. at 974.)  There was no edema or cyanosis of the extremities.  (R. at 974.)  Dr. Loo advised Addington to continue sertraline.  (R. at 974.)

When Addington returned to Dr. Moore on June 16, 2015, his physical examination and Dr. Moore's diagnoses remained the same.  (R. at 654-55.)  Dr. Moore refilled Addington's Norco and Klonopin.  (R. at 655.)

Addington saw Dr. Souhail Shamiyeh, M.D., at the VA on June 22, 2015, for various physical complaints unrelated to his right shoulder.  (R. at 958.)  He reported he was having a hard time with his father's death the previous month, as he was his caregiver for 12 years.  (R. at 958.)  Addington endorsed, among other things, arthralgias, right shoulder problems, anxiety, depression and stress.  (R. at 959.)  He had a normal musculoskeletal examination, except for tenderness at the base of the left big toe; a normal gait; symmetric deep tendon reflexes; and he was alert and oriented, but crying.  (R. at 961.)  Dr. Shamiyeh's diagnoses included depression, and he noted Addington had not yet started Zoloft.  (R. at 961.)

On July 7, 2015, Addington saw Dr. Moore for completion of disability forms. (R. at 657.) Examination of the right shoulder showed pain with abduction and external rotation; tenderness over the biceps tendon; subacromial bursal tenderness; and restricted abduction to 90 degrees. (R. at 658.) On the same day, Dr. Moore completed a physical assessment of Addington, opining he could lift and carry items weighing up to five pounds occasionally and up to two pounds frequently. (R. at 661.) He opined Addington could stand/walk a total of three hours in an eight-hour workday, but could do so for 30 minutes without interruption. (R. at 661.) Dr. Moore further opined Addington could sit a total of three hours in an eight-hour workday, but for 30 minutes without interruption. (R. at 662.) He found Addington could never climb, stoop, kneel, balance, crouch or crawl, and his abilities to reach, to handle, to feel and to push/pull were affected by his impairment. (R. at 662.) Dr. Moore opined Addington could not work around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 663.) He found Addington would be absent from work more than two days monthly. (R. at 663.)

On July 17, 2015, Addington called Dr. Shamiyeh, stating he stopped taking the Zoloft, as it caused increased depression and some "dark thoughts." (R. at 951.) Addington was advised to go to the emergency department for a psychiatry evaluation. (R. at 951.)

Addington was hospitalized at the Mountain Home VA Hospital from July 20, 2015, to July 28, 2015, for worsening depression and suicidal ideation after beginning the Zoloft. (R. at 739.) However, he denied suicidal or homicidal ideations or plans at the time of admission. (R. at 739.) Addington reported he had been feeling severely depressed for more than a month. (R. at 738.) He listed his stressors as including ongoing shoulder problems; loss of his job; denial of his

disability claim; becoming ill with mononucleosis; his father's death in May 2015; and chronic pain.  (R. at 737.)  Addington's wife stated he had not been compliant with his psychiatric medications because they did not make him feel well.  (R. at 738.)  He endorsed a depressed mood; anhedonia; significant weight loss; insomnia; fatigue or loss of energy; feelings of hopelessness, helplessness or worthlessness; poor concentration and memory; poor motivation; poor interest in previously enjoyed activities; panic attacks with agoraphobia; and anxiety or excessive worry about his health.  (R. at 738-39.)

Addington was treated inpatient with Cymbalta, and his mood and affect improved steadily and daily.  (R. at 739.)  At the time of discharge on July 28, 2015, Addington's physical examination was normal, including no clubbing, cyanosis or edema; no gross musculoskeletal abnormality and intact and symmetric strength in all extremities; no focal neurological deficits, an unremarkable gait and no abnormal movements or tremors.  (R. at 739-40.)  On mental status examination, Addington was well-groomed with good eye contact; his behavior was calm, cooperative, friendly and socially appropriate; he had normal speech; his mood was good with congruent affect, but with a somewhat anxious baseline; thought processes were linear, logical and goal-directed; he had no overt delusions or paranoia; he denied hallucinations and displayed no overt psychosis; executive functions were intact; and judgment and insight were good.  (R. at 740.)  Addington was advised to follow up with outpatient support and strongly consider raising the Cymbalta dosage from 40mg to 60mg if necessary for full remission of depressive symptoms.  (R. at 739.)  It was noted that Addington received maximum benefit during this hospitalization.  (R. at 739.)  His diagnosis upon discharge was major depressive disorder with suicidal ideation.  (R. at 741.)

Addington returned to Webb at the VA for mental health medication management on August 3, 2015. (R. at 1184.) At that time, he reported his eight-day hospitalization, during which he was stabilized and discharged on Cymbalta and trazodone. (R. at 1185.) Addington reported he had been doing "pretty good." (R. at 1185.) He further reported he had discontinued Ambien and Klonopin. (R. at 1185.) Addington advised his father had passed away since his prior visit. (R. at 1185.) He stated the Zoloft caused suicidal thoughts, for which he admitted himself. (R. at 1185.) Addington reported a "pretty good" appetite; a "good" mood; getting out more, visiting friends and family and going out to eat and to shop; he denied overt symptoms of depression, mania or anxiety. (R. at 1185.) He stated, "Just getting into the VA and talking in all the groups and with other veterans helped me before I even got on the Cymbalta." (R. at 1185.) He further stated, "I just need to stay positive, and the physical things are getting better. That's not me – being down – I'm not that person." (R. at 1185.) Physical examination revealed Addington was alert and fully oriented; he was dressed appropriately; he was maintaining adequate personal hygiene; his gait was smooth and steady; he was cooperative; he had no psychomotor retardation or agitation; he maintained appropriate eye contact; mood was good with a broad and congruent affect; speech was normal; thought processes were logical and goal-directed; he denied hallucinations and paranoia, as well as delusional beliefs and suicidal/homicidal ideation, plan or intent; remote, recent and immediate recall were intact; there was no change in cognitive function; and insight and judgment were intact. (R. at 1188.) Webb diagnosed major depressive disorder, single episode, severe, without psychotic features, and she continued Cymbalta and trazodone. (R. at 1188.) Webb scheduled Addington with an outside counselor. (R. at 1188.)

On August 11, 2015, Addington saw Tawny Booher, a nurse practitioner at

the VA, with various physical complaints not related to his shoulder. (R. at 1181.) He requested to discontinue Norco because it was "messing with his head" and contributing to worsening depression. (R. at 1181.) On examination, Addington was alert and fully oriented with a steady gait, a normal range of motion of the extremities with full motor strength in both upper extremities and 2+ and equal biceps reflexes. (R. at 1182.) Booher diagnosed, among other things, major depressive disorder, single episode, severe, without psychotic features. (R. at 1182.)

Addington saw Dr. Shamiyeh on August 17, 2015, with complaints of continued right shoulder problems with range of motion and pain, as well as anxiety, depression and stress. (R. at 1178.) Physical examination was unremarkable. (R. at 1180.)

On September 17, 2015, Addington returned to Dr. Moore with complaints unrelated to his shoulder. (R. at 1018.) Dr. Moore's physical examination of Addington remained the same, as did his diagnoses. (R. at 1019-20.) He refilled Addington's Norco, Klonopin and Cymbalta. (R. at 1020.)

Addington returned to Dr. Shamiyeh on November 20, 2015, for a follow-up appointment. (R. at 1163.) He, again, voiced some physical complaints unrelated to his right shoulder. (R. at 1163.) Addington stated he was trying to be more active. (R. at 1163.) He reported some continuing problems with depression and requested to increase his Cymbalta dosage until he saw Webb for a follow up. (R. at 1163.) On examination, he had no extremity edema. (R. at 1166.)

Addington saw Webb for mental health medication management on December 9, 2015. (R. at 1155.) He stated he had been "pretty good," but he had

requested Dr. Shamiyeh increase his Cymbalta dosage.  (R. at 1156.)  He further reported continuing to grieve his father's death.  (R. at 1156.)  Addington asked Webb to reduce his Cymbalta, as the increased dosage made him feel "fuzzy headed," and he was doing better on the lower dosage. (R. at 1156.) He also reported grieving the loss of his job and social interaction with his co-workers, as they were a "tight bunch." (R. at 1156.)  Addington stated he continued to visit them and eat lunch together from time to time.  (R. at 1156.)  He denied overt symptoms of depression, mania or anxiety.  (R. at 1156.)  His examination was unchanged from previously, and Addington stated his mood was "okay."  (R. at 1158.)  Webb continued to diagnose major depressive disorder, single episode, severe without psychotic features, improved.  (R. at 1159.)

Addington saw Dr. Moore on December 17, 2015, with complaints unrelated to his shoulder.  (R. at 1021.)  Again, the physical examination and Dr. Moore's diagnoses were unchanged.  (R. at 1022-23.)  He refilled Addington's Norco and Klonopin.  (R. at 1023.)  That same day, Dr. Moore completed a form, generated by Addington's counsel, opining, to a reasonable degree of medical certainty, that Addington's health conditions prevented him from performing the duties of an operating room technician.  (R. at 1026.)  Specifically, Dr. Moore stated Addington could not lift over 10 pounds and could perform no work above shoulder level.  (R. at 1026.)

Likewise, on March 8, 2016, Dr. Shamiyeh completed a form, prepared by Addington's counsel, opining that his health conditions prevented him from performing the duties of an operating room technician. (R. at 1028.) Dr. Shamiyeh also indicated his belief that Addington had been disabled from August 8, 2014, to the time he completed the form.  (R. at 1028.)  Dr. Shamiyeh explained that

Addington suffered problems with infectious mono followed by chronic fatigue which had not resolved. (R. at 1028.) He also stated Addington had weakness, urinary/prostate problems, neck pain, shoulder pain, insomnia and depression. (R. at 1028.)

On March 17, 2016, Addington again saw Dr. Moore with complaints unrelated to his shoulder. (R. at 1207.) His physical examination and diagnoses remained unchanged, and Dr. Moore refilled Addington's Norco and Klonopin. (R. at 1208-09.) That same day, Dr. Moore completed another one of these attorney-generated forms, stating Addington had been disabled from November 13, 2013, through the present date due to his shoulder injury. (R. at 1030.)

On April 12, 2016, Addington returned to Webb, stating he had been "alright." (R. at 1109.) He stated he continued to grieve the loss of his job and social interaction with his co-workers, but he continued to visit them and eat lunch together from time to time. (R. at 1110.) Addington denied overt symptoms of depression, mania or anxiety, and he described his mood as, "overall, good." (R. at 1110.) Addington reported medication compliance without side effects. (R. at 1110.) His examination remained unchanged, and he described his mood as "good." (R. at 1112.) Webb continued to diagnose major depressive disorder, single episode, severe without psychotic features, in partial remission. (R. at 1112.)

On June 3, 2016, Addington saw Dr. Shamiyeh for a routine follow up with complaints unrelated to his right shoulder. (R. at 1103.) He stated he had been more active lately, he was eating better, he had been helping his father-in-law, and he had been working part-time. (R. at 1003.) Addington reported his depression was improved on Cymbalta. (R. at 1004.) On examination, Addington had no extremity

edema.  (R. at 1006.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Addington argues that the ALJ erred by improperly determining his residual functional capacity and failing to find he was disabled prior to June 10, 2016. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) In particular, Addington argues that the ALJ erred by failing to give controlling weight to the opinions of treating physician, Dr. Moore. (Plaintiff's Brief at 5-6.)

The ALJ found that Addington had the residual functional capacity to perform simple, routine light work that required no more than frequent kneeling, stooping, crouching or climbing of ramps and stairs; no more than occasional pushing/pulling with the right upper extremity or reaching in any direction; no more than occasional crawling or climbing of ladders, ropes or scaffolds; and no work around hazards. (R. at 22.)

In making this residual functional capacity finding, the ALJ stated that he was giving "limited weight" to Dr. Moore's opinions. (R. at 24.) I first will address Addington's physical capabilities. In this regard, the court notes that it has limited its consideration to Addington's right shoulder impairment and its related functional limitations, as this was the only severe physical impairment the ALJ found, and Addington did not argue that the ALJ erred by failing to find any of his other physical

impairments "severe." In September 2014 and July 2015, Dr. Moore opined Addington could lift/carry a maximum of five pounds. In December 2015, Dr. Moore opined Addington was unable to perform the duties of his past relevant work as an operating room technician because he could not lift more than 10 pounds or perform work above shoulder level. In March 2016, Dr. Moore opined Addington was disabled by his shoulder injury since November 13, 2013. Dr. Moore also completed physical and mental assessments in December 2016; however, because this is subsequent to the date on which the ALJ found Addington to be disabled, the court will not address these opinions. The ALJ stated he was giving limited weight to Dr. Moore's opinions as to Addington's physical limitations, as they were inconsistent with the treatment record. (R. at 24.) Specifically, the ALJ stated that, while the preponderance of the evidence showed Addington had some decreased strength and range of motion in his right shoulder, this evidence did not comport with Dr. Moore's opinion that he was limited to lifting a maximum of five to 10 pounds. (R. at 24.)

As the ALJ stated, the treatment records show Addington continued to have some decreased strength and range of motion in his right upper extremity. However, the record shows that after Addington's initial shoulder injury in November 2013, and following his subsequent shoulder manipulation in June 2014 to treat adhesive capsulitis, Addington had improvements in strength and range of motion. In January 2014, he reported improved range of motion with home exercises, and he stated Celebrex helped. At that time, Addington had a full range of motion, well-maintained strength, and he was neurovascularly intact. Addington was making "good progress" according to Dr. Parks. In February 2014, Addington reported daily ibuprofen provided relief, and he stated a December 2013 injection had been helpful, estimating he was at least 50 percent improved. At that time, a shoulder examination

again showed full range of motion, well-maintained strength, no instability and no neurovascular deficits. In March 2014, following arthroscopic surgery, Addington had an appropriate range of motion, and the right shoulder was neurovascularly intact. In April 2014, he had normal reflexes and sensation, bilaterally; no right shoulder swelling; and he was neurovascularly intact. Pain and swelling continued to improve "as expected." Both physician assistant Cook and Addington were pleased with the progress, and Addington was referred for physical therapy.

Addington underwent physical therapy for the right shoulder from April 2014 through September 2014. His rehab potential was deemed "good" with treatment compliance. In June 2014, Dr Wells performed a manipulation of Addington's right shoulder, and he administered intra-articular corticosteroid injections. Dr. Wells reported this procedure restored full range of motion in all planes. Later that month, Addington reported improved range of motion, and Dr. Wells described it as "greatly improved." He stated Addington was "moving in the right direction," and both Dr. Wells and Addington felt he was doing "much better." On June 20, 2014, Addington reported an improved ability to perform activities of daily living. In July 2014, he reported moving and using his arm more at home, and physical therapist Ward stated Addington had responded well to physical therapy with positive improvement. On July 16, 2014, Addington stated his range of motion was getting "much better," and Dr. Wells stated he had made "vast improvements." He released Addington to light-duty work with restrictions to no lifting greater than 10 pounds and no overhead use of the right upper extremity, and he was encouraged to continue home exercises "religiously." Dr. Wells stated Addington was doing much better after the manipulation. On August 8, 2014, Addington stated his shoulder was doing "pretty good," with some continued pain and stiffness since he stopped taking ibuprofen due to stomach upset. Dr. Wells noted he was maintaining his range of motion with

some mild discomfort with extremes, and he had good biceps tone.  He believed Addington was "getting close to having a full recovery."

By September 3, 2014, Addington stated he no longer was taking pain medications, and he demonstrated increased mobility.  On September 24, 2014, Addington told Dr. Wells his shoulder was doing "pretty good," he had near full range of motion, and Dr. Wells released him to "ad-lib activity without restrictions." A physical examination performed by Dr. Moore that same day was normal.  When Addington was discharged from physical therapy on September 29, 2014 Ward again reported he had responded well to physical therapy with positive improvement, and he instructed Addington to continue home exercises.  Addington saw Dr. Moore on five other occasions through January 21, 2015.  In October and November 2014, physical examinations were completely normal.  In December 2014, Addington had pain and tenderness with range of motion.  Nonetheless, on January 14, 2015 Dr. Wells stated Addington was doing fairly well.  On January 21, 2015, Addington noted continued significant right shoulder pain and limited motion, but physical examination showed only pain with abduction and external rotation, tenderness over the biceps tendon and subacromial bursa and restricted abduction to 90 degrees. When Addington presented to the VA in March 2015, he stated his shoulder was "better now."  Later that month, the right shoulder exhibited pain in some planes of movement, tenderness and restricted abduction to 90 degrees.  In April 2015, a musculoskeletal examination revealed normal range of motion and no edema or tenderness.  Later that month, there, again, was no extremity edema, and in June 2015, Addington had another normal physical examination.  In July 2015, he had pain with certain movement and tenderness.  On July 28, 2015, a physical examination, again, was normal, including intact and symmetric strength in all extremities.  On August 11, 2015, Addington had normal range of motion of the

extremities with full motor strength and 2+ and equal biceps reflexes. On August 17, 2015, he had no extremity edema. On November 20, 2015, Addington stated he was trying to be more active. He again had no extremity edema. On June 3, 2016, he stated he had been more active, he had been helping his father-in-law, and he had been working part-time. He had no extremity edema.

Based on the above, I find that Dr. Moore's physical assessments of Addington are not supported by the totality of the medical evidence of record. While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 404.1527(c) (2019). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Although Dr. Moore is a treating physician, his opinions are not supported by clinical evidence and they are inconsistent with other substantial evidence, as set out above. Additionally, Dr. Moore's opinions are inconsistent with his own treatment notes, which reveal largely normal or mild physical examinations of Addington. Lastly, in Dr. Moore's March 2016 opinion, he stated Addington had been disabled by his shoulder injury since November 13, 2013. Statements that a claimant is disabled or unable to work are not medical opinions, but administrative findings that are reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1) (2019). For all these reasons, I find that the ALJ properly afforded Dr. Moore's opinions as to Addington's physical limitations limited weight.

Conversely, the ALJ gave great weight to the opinions of the state agency physicians, as they were consistent with the treatment record, including records

submitted subsequent to state agency review. (R. at 23.) Under the regulations, the ALJ was entitled to rely on the state agency physicians' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."). Similarly, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2019). Here, state agency physician Dr. Rutherford opined Addington could perform light work that did not require more than occasional pushing/pulling with the right upper extremity, no more than occasional reaching in front and/or laterally, as well as overhead, with the right upper extremity, and other physical limitations unrelated to his shoulder. The evidence of record, as set forth above, supports such an assessment. The ALJ also stated he was giving great weight to Dr. Breeding's November 2013 opinion that Addington could perform very light use of the right arm, as it was supported by the evidence, including examinations, as well as Addington's subjective complaints. I find that the above-stated medical evidence supports the ALJ's weighing of this opinion evidence, as well as the ALJ's ultimate finding that Addington could perform a limited range of light work prior to June 10, 2016.

With regard to Addington's mental impairments, the ALJ found he suffers from a severe depressive disorder. Dr. Moore did complete a December 2016 mental assessment of Addington, but, as stated herein, this was approximately six months after the date the ALJ found Addington was disabled. Thus, the court finds it unnecessary to discuss this opinion or the ALJ's weighing of it. However, I find that the ALJ's residual functional capacity finding adequately accounts for Addington's mental health impairments and related functional limitations. Specifically, the ALJ limited Addington to the performance of simple work.

Addington suffered depression after he lost his job October 2014, which was exacerbated by his father's death in May 2015. In March 2015, state agency psychologist Montgomery opined Addington was not restricted in his activities of daily living, he had no difficulties in maintaining social functioning, he had mild difficulties maintaining concentration, persistence or pace, and he had experienced no episodes of extended-duration decompensation. Later that month, a depression screen indicated moderate depression. On March 25, 2015, Webb, a nurse at the VA, began treating Addington's mental health impairments. He reported becoming depressed after losing his job in October 2014, and he reported anxiety over finances, his father's failing health, frequent crying spells and isolative behavior. Nonetheless, mental status examinations largely were normal, except for a depressed mood at times. On April 23, 2015, Addington had a normal mood, affect and behavior. On April 29, 2015, he was somewhat anxious, stating he had been under a lot of stress since losing his job. In June 2015, Addington reported having a hard time with his father's death the prior month. On July 17, 2015, Addington reported he stopped taking Zoloft because it caused depression and "dark thoughts," and he checked himself in for psychiatric hospitalization a few days later for suicidal ideation. Addington's mood and affect improved steadily and daily with medication.

At discharge on July 28, 2015, he had a normal mental status examination, including normal mood and affect. By August 3, 2015, he reported doing "pretty good" with a "good" mood, and he had been getting out more, visiting family and friends and going out to eat and shop. According to Addington, he needed to stay positive, and he stated talking with groups at the VA helped him. Mental status examination was, again, normal. In November 2015, Addington requested his medication be increased, but by December 9, 2015, he requested to return to the lower dosage. At that time, he reported grieving the loss of his job and the social interaction with his co-workers, as they were a "tight bunch." He stated he continued to visit them and eat lunch together from time to time. He denied overt symptoms of depression or anxiety. On April 12, 2016, Addington stated he had been "alright," and he continued to report social interactions with his former co-workers. He, again, denied overt symptoms of depression and anxiety, and he described his mood as "good." On June 3, 2016, Addington reported his depression was improved with Cymbalta.

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding that Addington had the residual functional capacity to perform a limited range of simple, light work. Thus, I find that substantial evidence exists to support the ALJ's finding that Addington was not disabled prior to June 10, 2016. An appropriate Order and Judgment will be entered.

DATED:    March 20, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE